UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JOHN HOCKENJOS, JR.,

<table>
<tr><td></td><td>Plaintiff,</td><td>14-cv-1679 (PKC)</td></tr>
</table>

       -against-                                MEMORANDUM
                                                    <u>AND ORDER</u>

METROPOLITAN TRANSPORATION
AUTHORITY, MTA METRO-NORTH
RAILROAD, HOWARD R. PERMUT,
individually, JOHN E. KENNARD, individually,
KIM A. SMITH, individually, and BRUCE M.
POLLACK, individually,

                       Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff John Hockenjos, Jr. brings this action against his former employers, the

Metropolitan Transportation Authority ("MTA") and the MTA Metro-North Railroad ("Metro-

North"), as well as four individuals, Howard R. Permut, John E. Kennard, Kim A. Smith, and

Bruce M. Pollack, pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, <u>et.

seq.</u>, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101, <u>et

seq.</u>, and New York Labor Law ("NYLL"), § 740, <u>et</u> <u>seq.</u>  Plaintiff contends that defendants

wrongfully interfered with his right to FMLA leave, and that he was terminated in retaliation for

exercising those rights.  Furthermore, plaintiff contends that defendant failed to offer him a

reasonable accommodation for his disability.  Defendant Metro-North has moved for summary

judgment on several grounds.  (Dkt. No. 46.)  For the reasons outlined below, defendant's

motion is GRANTED.

BACKGROUND

Plaintiff John Hockenjos was hired by Metro-North in 1998 to work in their Capital Program Department as an Assistant Director.  (R. 56.1 Statement ¶ 1.)[1]  A reorganization of his department in or around 2002 resulted in plaintiff's demotion to Senior Scope Engineer.  (Hockenjos Dep. 26-27.)  From that point on, plaintiff reported to Kim Smith, Deputy Director.  (R. 56.1 Statement ¶ 2.)  As Senior Scope Engineer, plaintiff was responsible for, among other things, budgeting with detailed cost analysis and determining the service life of various assets, such as train stations and power equipment.  (Hockenjos Dep. 28-29.)

I.   Job Performance Prior to 2010

As plaintiff's supervisor, Smith was responsible for generating his annual performance reviews from 2003 to 2011.  (R. 56.1 Statement ¶ 12.)  In 2003, Smith observed that plaintiff had to "continue to improve his communication efforts in dealing with questions from the Director and Vice President on various capital project items."  (2003 Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000036.)  Nevertheless, she also indicated that plaintiff was "very cognizant of the needs of the internal customers he deals with on a regular basis." (Id.)  Overall, Smith submitted a "positive recommendation" for plaintiff.  (Smith Dep. 72.)

In later years, Smith continued to note that plaintiff "communicates well with the groups he works with," "collaborates well with others," and "work[s] well with both internal and external customers."  (2005 Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000044-45; see also 2006 Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000054; 2008 Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000077-78; 2009 Performance Review, Cohen Decl. ¶ 2,

---

[1] Unless otherwise noted, citations to (Rule 56.1 ¶ __) refer to undisputed facts submitted by plaintiff in response to Defendant's Local Rule 56.1 Statement.

Ex. A, at D-000086-87.)  While Smith testified that plaintiff's reviews were overall positive

(Smith Dep. 77, 83, 89-90, 139-40, 143, 148), she also recognized his need for improvement.

Specifically, Smith continued to record plaintiff's need to improve communication skills with

internal management.  (2005 Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000045; 2006

Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000054; 2008 Performance Review, Cohen

Decl. ¶ 2, Ex. A, at D-000077; 2009 Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-

000087).

## II.  Personal Issues Impact Plaintiff's Job Performance

In 2010, plaintiff continued to provide "good work," and met expectations for five

out of the six performance goals on his review.  (2010 Performance Review, Cohen Decl. ¶ 2,

Ex. A, at D-000088.)  Smith also noted, though, that any improvement that plaintiff was making

was "thwarted by [a] personal situation."  (Id.)  That issue—a private property dispute that

plaintiff was having with his neighbor—took plaintiff's "focus away from the work tasks at

hand."  (Id.; R. 56.1 Statement ¶ 22.)  While plaintiff met expectations overall, his review

indicated that "going forward [plaintiff] must work to ensure that these distractions do not impact

his ability to complete his work products and deliverables in a timely manner."  (2010

Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000088; Smith Dep. 148.)

Plaintiff's property dispute with his neighbor continued to be a distraction in

2011.  (Hockenjos Dep. 103-104.)  Relying on accrued vacation and sick time, plaintiff was

absent for all or part of 95 workdays throughout 2011.  (R. 56.1 Statement ¶ 33.)  Plaintiff's

absences contributed to his inability to complete work assignments.  (2011 Performance Review,

Cohen Decl. ¶ 2, Ex. A, at D-000092 (noting that plaintiff "continued to have personal issues at

his home that significantly impacted workload/task elements and timeliness of efforts throughout

2011").)  In particular, plaintiff's absences resulted in his "capital work responsibility . . . [to be] transferred to others in the department."  (Id.)  Smith also noted that plaintiff's absences "resulted in a significantly reduced level of productivity and an additional workload for the remainder of the department."  (Id.)  While plaintiff again met expectations overall in his 2011 performance review, he failed to meet expectations on three of the six goals in his reviews, and his performance "was very closely on the border of below expectations."  (Id.)

        In addition to his ongoing property dispute, plaintiff admitted to additional distractions at home that he claimed "escalated to criminal acts, street gangs coming to [his] home just prior to [his] false arrest by the NYPD."  (R. 56.1 Statement ¶ 40 (quoting Hockenjos Dep. 111).)  As a result of the mounting distractions, plaintiff began suffering from anxiety and insomnia, both of which made it difficult for him to arrive at work on time.  (Hockenjos Decl. ¶ 6; Hockenjos Dep. 224.)  He started seeing Dr. Irena Pleskova.  (R. 56.1 Statement ¶ 39.)  Dr. Pleskova testified that plaintiff was undergoing a lot of stress since she first met with him in November 2011, and diagnosed him with acute stress disorder in February 2012.  (Pleskova Dep. 95.)  Plaintiff also requested that he be permitted to start at a later time, but Smith refused, citing Metro-North policy requiring all employees to arrive by 9:00 a.m.  (Smith Dep. 163.)

        On February 5, 2012, plaintiff was arrested in his driveway and held in police custody for several days.  (R. 56.1 Statement ¶ 41.)  While those charges were ultimately dismissed, plaintiff claims that his mental health deteriorated significantly as a result of his arrest.  (Id. ¶¶ 42-43; Hockenjos Dep. 93-95, 99, 102.)  Consequently, plaintiff had increased difficulty reporting to work on time.  (Hockenjos Dep. 362-363.)  In addition, Smith had to frequently seek information from plaintiff regarding the progress of his work.  (Lipton Decl., Ex. 11.)  Plaintiff repeatedly missed deadlines, despite Smith's insistence on completing work in a

timely manner.  (Id.)  On some occasions, Smith had to send multiple emails to plaintiff to remind him of his work assignment.  (See, e.g., id. at D-000499, D-000513.)

Starting in June 2012, Smith also began receiving emails from Irina Hockenjos, plaintiff's wife.  (Lipton Decl., Ex. 12, 13.)  Ms. Hockenjos inquired into the whereabouts of plaintiff, and often questioned why plaintiff remained at work until after midnight.  (See, e.g., id. at D-000488, D-000512.)  Plaintiff's wife also berated Smith and blamed her for plaintiff's late-working hours.  (See, e.g., id. at D-000492 ("What . . . is he working on that it would not let him possib[ly] make even one phone call . . . .").)  A contemporaneous memorandum by Smith also indicates that Ms. Hockenjos called her and "left . . . a fairly nasty message asking why I never pick up the telephone and saying that she is going to start an investigation into why I do not answer my telephone when [plaintiff] always has to be working."  (Lipton Decl., Ex. 12 at D-000515.)  Despite Smith's discussions with plaintiff to stop his wife from contacting her, plaintiff's wife continued to do so.  (R. 56.1 Statement ¶ 52.)

As a result of plaintiff's job performance and the emails from his wife, Smith referred plaintiff to the Metro-North's Employment Assistance Program ("EAP").  (Id. ¶ 54.)  In addition to participating in EAP, plaintiff attended a time management course in August 2012.  (Id. ¶ 57.)  Nevertheless, plaintiff continued to have difficulty concentrating on his work.  (Id. ¶ 60)  In addition, "he had issues with his memory, and his judgment was affected."  (Id.)  Plaintiff also admitted that working on personal matters "helped alleviate some stress so that he could be more effective at work."  (Id. ¶ 61.)  A compilation of emails from plaintiff to various individuals indicate that he worked on personal matters while at work at various times throughout 2012.  (Lipton Decl., Ex. 16.)  Plaintiff also had difficulty working on multiple tasks, and needed more time to complete tasks.  (R. 56.1 Statement ¶¶ 62-64.)

III. Plaintiff's First FMLA Leave

On September 4, 2012, plaintiff completed an FMLA application seeking continuous leave beginning September 5 and ending September 25, 2012.  (September FMLA Application, Cohen Decl., Ex. L.)  His application included a medical certification from Dr. Pleskova, which stated that plaintiff suffered from Acute Stress Disorder that caused, among other things, insomnia and difficulty concentrating.  (Id.; R. 56.1 Statement ¶ 103.)  In addition, Dr. Pleskova noted that plaintiff was unable to concentrate and suffered from shortness of breath, chest pain, dizziness, insomnia and nightmares.  (R. 56.1 Statement ¶ 107.)  Dr. Pleskova recommended that plaintiff receive three weeks of continuous leave, as well as a reduced schedule upon return.  (September FMLA Application, Cohen Decl., Ex. L, at D-000204.)  Plaintiff submitted the FMLA application to Smith later that day, who signed the form as his supervisor.  (R. 56.1 Statement ¶¶ 97-98.)  Plaintiff was approved for FMLA the following day.  (September FMLA Application, Cohen Decl., Ex. L.)

On the same day, plaintiff met with Smith and John Kennard, the Senior Director of Capital Planning and Programming, to discuss plaintiff's job performance.  (R. 56.1 Statement ¶ 66.)  During the meeting, Smith and Kennard outlined plaintiff's work-performance issues, including "his inability to 'multi-task;' his missing deadlines; his not responding to Smith's emails; his arrival time at work; his absenteeism; the way he was using his vacation leave time; and his wife's email and phone communications."   (Id. ¶ 74.)  Smith indicated that plaintiff's failure to improve his performance could result in his termination.  (Meeting Discussion Points, Cohen Decl., Ex. F, at D-000015.)  Smith also reiterated the department's policy requiring all employees to arrive before 9:00 a.m., and that plaintiff had to abide by Metro-North's policy on vacation leave.  (R. 56.1 Statement ¶¶ 78, 81.)  Plaintiff admitted that he would have difficulty in

complying with the above-referenced policies, because his mental health issues sometimes necessitated him come in later than 9:00 a.m. or miss days on short notice.  (Id. ¶¶ 82-83.) Plaintiff admitted that he needed to work on his performance issues, but also noted that these issues were a consequence of his mental health issues.  (Id. ¶ 99; Hockenjos Dep. 131-32.)

IV. Plaintiff's Performance After his Return from FMLA Leave: October 2012–February 2013

Although plaintiff was scheduled to return to work on September 27, 2012, he was unable to secure his doctor's clearance to return until October 1, 2012.  (R. 56.1 Statement ¶ 112.)  Upon returning to work, Smith testified that plaintiff was "making strides to . . . follow the improvement plan that we had laid out."  (Smith Dep. 206.)  However, in late October 2012, Superstorm Sandy caused plaintiff to experience difficulty in getting to work.  (Hockenjos Decl. ¶¶ 44-48.)  Plaintiff also continued to miss deadlines and was non-responsive to emails from Smith.  (Lipton Decl., Ex. 25 at D-000596, D-000604, D-000607-608.)  Moreover, Smith began to receive emails again from plaintiff's wife in November 2012.  (R. 56.1 Statement ¶ 114.)  By the end of 2012, plaintiff had exhausted all of his sick and vacation time.  (Id. ¶ 115)  In total, plaintiff only worked six full days and two partial days in December.  (Id.)  However, none of his absences in December were related to his FMLA leave.

On January 2, 2013, Smith emailed plaintiff to inform him that, due to his excessive absenteeism, "he needed to provide a doctor's note in order to return to work."  (Id. ¶ 116.)  Smith also informed plaintiff that he could apply for more FMLA leave.  (Id.)  Plaintiff did not apply for leave, and returned to work after providing a doctor's note.  (Lipton Decl., Ex. 27 at D-000642.)  Despite not taking FMLA leave, plaintiff only worked four full days and five partial days in January 2013.  (R. 56.1 Statement ¶ 117.)

Shortly after returning to work, plaintiff began seeing a psychologist, Dr. Moses Weksler.  (Id. ¶ 118.)  Plaintiff initially reported to Dr. Weksler that he had to work harder to concentrate, but it did not interfere with his ability to function.  (Weksler Dep. 34.)  Shortly thereafter, though, plaintiff admitted that he "lost his power of concentration" and that he "was warned that he may be let go if he doesn't become more productive."  (Dr. Weksler Progress Notes, Lipton Decl., Ex. 30 at DMW000063.)  Dr. Weksler noted that at various times from October 2012 to March 2013, plaintiff reported sleeplessness, feeling fearful, anxiety, depression, and crying episodes.  (R. 56.1 Statement ¶ 130.)

On January 18, 2013, Smith met with Kennard and Adrienne Cortez, the Director of Human Resources, to review plaintiff's job performance.  (Calendar Invite entitled "Employee Relations: J. Hockenjos Review Meeting," Lipton Decl., Ex. 32 at D-000678; see also Smith Dep. 227-228; Kennard Dep. 134-135.)  Smith and Kennard swear that the decision to terminate plaintiff's employment was made at this meeting.  (Smith Dep. 237-238 (testifying that she met with Kennard and others on that day and "decided to terminate Mr. Hockenjos"); Kennard Dep. 138 (noting that from Kennard's perspective, the decision to terminate Mr. Hockenjos "had been made on [January] 18th").  Two days after the January 18 meeting, Smith began drafting a memorandum that outlined multiple problems with plaintiff's job performance.  (Lipton Decl., Ex. 33.)  The memorandum was drafted nearly a month before plaintiff sought FMLA leave, and after a full opportunity to conduct discovery, there is no evidence that the memorandum was fabricated or back dated at a later point in time.  There is also no evidence that defendant knew at that time that plaintiff would request FMLA leave from Smith on February 14, 2013.  The final version of the memorandum, more than five pages long, was sent to Cortez on February 26, 2013.  (Lipton Decl., Ex. 8.)

V.  Plaintiff's Second FMLA Leave

On February 14, 2013, plaintiff submitted a second FMLA application, along with a medical certification prepared by Dr. Weksler, to Smith for approval.  (R. 56.1 Statement ¶ 141.)  Plaintiff sought an additional three weeks of continuous leave, as well as intermittent leave upon his return.  (February 2013 FMLA Application, Cohen Decl., Ex. N at D-000241.)  Dr. Weksler noted that plaintiff could not concentrate on documents, and that plaintiff felt depressed, anxious, and suffered from insomnia.  (R. 56.1 Statement ¶¶ 144-46.)  Plaintiff's request for continuous leave, followed by intermittent leave, was granted.  (Id. ¶ 148.)

VI. Plaintiff's Termination

Plaintiff was cleared to return to work by Dr. Weksler on March 20, 2013. (Cohen Decl., Ex. U at D-000412.)  On the day he returned from his continuous leave, he was informed that he had been terminated.  (R. 56.1 Statement ¶ 154.)   Plaintiff filed this action less than one year later.  (Dkt. No. 1.)  Defendant Metro-North now moves for summary judgment.

STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The movant has the initial burden to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief as a matter of law.  Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotations and citations omitted).  In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants.  Rule 56(c), Fed. R. Civ. P. In the absence of any disputed material facts, summary judgment is appropriate.  Id.

DISCUSSION

I.     FMLA Claims

The Second Circuit recognizes two distinct claims under the FMLA, interference and retaliation.  See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).  Here, plaintiff asserts claims under both theories.

1.   Interference

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FLMA.  29 U.S.C. § 2615(a)(1).  To succeed on an FMLA interference claim, plaintiff must establish:

> 1) that she is an eligible employee under the FMLA; 2) that defendant is an employer as defined in FMLA; 3) that she was entitled to leave under FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under FMLA.

Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004) (citing Santos v.

Knitgoods Workers' Union, Local 155, No. 99 cv 1499 (BSJ), 1999 WL 397500 at *3 (S.D.N.Y.

June 15, 1999), aff'd, 252 F.3d 175 (2d Cir. 2001)).  Defendant moves for summary judgment

solely on the fifth prong of this test, claiming that plaintiff has failed to "establish that he was

denied any benefit under the FMLA."  (Def.'s Br. 13).

        The FMLA guarantees two benefits to employees.  First, an employee has a right

to take leave for the treatment of a serious health condition.  29 U.S.C. § 2612(a)(1).  This

includes intermittent leave, which may be taken "when medically necessary for planned and/or

unanticipated medical treatment of a serious health condition . . . or for recovery from

treatment."  29 C.F.R. § 825.202.  To succeed on a right-to-leave claim, an employee may show

"by a preponderance of the evidence that her taking of FMLA-protected leave constituted a

negative factor in the decision to terminate her."  Potenza, 365 F.3d at 167 (quoting Bachelder v.

Am. W. Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001)).  Alternatively, an employee may

demonstrate that the employer discouraged him from taking FMLA leave.  Id. (citing 29 C.F.R. §

825.220(b)).  Second, an employee has a right to be reinstated to the former position or an

equivalent position at the end of his or her leave. 29 U.S.C. § 2614(a).

        However, the "FMLA does not entitle an employee taking FMLA leave to any

greater rights than employees who have not taken such leave."  Santos, 1999 WL 397500, at *3

(citing 29 U.S.C. § 2614(a)(3); 29 C.F.R. § 825.216(a)), aff'd, 252 F.3d 175 (2d Cir. 2001).

Indeed, the FMLA contemplates an employer's right to terminate an employee at any time

during FMLA leave as well as the right to refuse to reinstate the employee.  29 C.F.R.

825.216(a)(1).  The taking of FMLA cannot be the cause for termination, though, and the

employer bears "the burden of proving that an employee would have been laid off during the

FMLA leave period and, therefore, would not be entitled to restoration." <u>Id.</u>  An employer's

responsibility to continue the employee's FMLA leave "cease[s] at the time the employee is laid

off." <u>Id.</u>

> i. <u>FMLA Interference Claim – Right to Intermittent Leave and Reinstatement</u>

Neither plaintiff's interference claim premised on his right to intermittent leave

nor his right to reinstatement are supported by the fully developed record.  Defendant has met its

burden of showing that plaintiff's termination was based on his poor job performance, not for

exercising his FMLA rights.  29 C.F.R. 825.216(a)(1).  Plaintiff has failed to come forth with

evidence that would allow a reasonable jury to conclude that his FMLA leave constituted a

negative factor in his termination.

Defendant has come forward with overwhelming evidence that plaintiff's job

performance was poor.  The record indisputably shows that plaintiff's job performance was

suffering before he requested either of his FMLA leaves, and it progressively worsened over the

years.  Starting in 2010, plaintiff failed to meet expectations on one of the six goals in his

performance review.  (2010 Performance Review, Cohen Decl. ¶ 2, Ex. A, at D-000088.)  In

2011, plaintiff's performance took a turn for the worse, and he missed a total of 95 days of work.

(R. 56.1 Statement ¶ 33.)  Plaintiff's performance review for that year also indicated that some of

his work had to be completed by others due to his absences.  (2011 Performance Review, Cohen

Decl. ¶ 2, Ex. A, at D-000092.)  Despite hope that his performance would improve in 2012, it did

not.  His excessive absenteeism continued into 2012, and he was referred to training classes to

improve his performance.  In addition to his absenteeism, plaintiff was unable to report to work

on time.  (R. 56.1 Statement ¶¶ 78, 79, 83.)  Plaintiff was often unresponsive to Smith's emails

(Lipton Decl., Ex. 11), which led to work not being completed on time.  (<u>See, e.g.</u>, <u>id.</u> at D-

000517.)  Plaintiff also had difficulty working on multiple tasks and concentrating on work.  (R. 56.1 Statement ¶ 60, 62.)  He admitted to working on personal matters while at the office, noting that doing so "helped alleviate some stress so he could be more effective at work."  (Id. ¶ 61.) Furthermore, plaintiff's wife sent inappropriate emails to Smith, berating and blaming her for plaintiff's work hours, which plaintiff admits he was unable to prevent or stop.  (Id. ¶ 52, 114.) When plaintiff returned from his first FMLA leave in October 2012, his performance did not improve.  Plaintiff's absenteeism continued, and he only worked six full days and two partial days in December 2012.  (Id. ¶ 115.)  In January 2013—a period when he was not on FMLA leave—plaintiff only worked four full days and five partial days.  (Id. ¶ 117.)  Plaintiff also continued to be non-responsive to Smith's emails and miss deadlines.  (Lipton Decl., Ex. 25 at D-000596, D-000604, D-000607-608.)  Moreover, Smith began to receive emails again from plaintiff's wife in November 2012.  (R. 56.1 Statement ¶ 114.)  As noted, Smith and Kennard swore that the decision to terminate plaintiff was made on January 18, 2013 at a meeting with the Director of Human Resources.

In the face of this evidence, plaintiff asserts that the Court should infer that his FMLA leave was a contributing factor to his termination based on the fact that he was terminated the day he returned from his continuous FMLA leave to start his intermittent leave.  (Pl. Br. 15.) However, the FMLA explicitly permits an employer to terminate an employee at any time during his or her leave.  29 C.F.R. 825.216(a)(1).  The evidence shows not only that plaintiff had a history of poor job performance, but that he continued to perform poorly after being referred to remedial training programs.  (R. 56.1 Statement ¶¶ 78, 79, 83.)  He continued to perform poorly after he was warned that he could face termination.  (Meeting Discussion Points, Cohen Decl., Ex. F at D-000015.)  And, he continued to perform poorly even after plaintiff himself admitted

- 13 -

that "he was warned that he may be let go if he doesn't become more productive." (Lipton Decl., Ex. 30 at DMW000063.) In light of the overwhelming evidence of plaintiff's poor job performance, as well as the mutual understanding that a failure to improve could lead to his termination, the mere fact that plaintiff was terminated the day he returned from his FMLA leave, without more, is insufficient at this stage to create a genuine issue of material fact. No reasonable jury could conclude that plaintiff was terminated for any reason other than his poor job performance.

Relying on Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155 (2d Cir. 1999), plaintiff argues that "the only circumstances in which it is permissible for an employer to deny an employee reinstatement or otherwise terminate him based on his medical condition prior to the exhaustion of the employee's full twelve (12) week allotment of FMLA leave is where it is 'undisputed that at the end of that period he remained unable to perform the essential functions of his [] position.'" (Pl.'s Br. 9.) This position is untenable and unsupported by the regulatory scheme. Sarno implicated the interpretation of subsection (c) of 29 C.F.R. § 825.216,[2] which provides:

> If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration to another position under the FMLA.

29 C.F.R. § 825.216(c). In applying subsection (c), Sarno held that the employee's ability to perform the essential functions of his job should be determined at the end of his FMLA leave. Sarno, 183 F.3d at 161. However, subsection (a) of the same regulation contemplates the

---

[2] At the time Sarno was decided, the regulation subsection in question was codified as subsection (d).

termination of an employee regardless of his ability to perform the essential functions of the job

upon his return, so long that "employee would have been laid off during the FMLA leave

period." 29 C.F.R. § 825.216(a)(1). Subsections (a) and (c) act as different limitations on an

employee's right to reinstatement. Therefore, whether plaintiff was capable of performing the

essential functions of his job upon his return from FMLA leave is irrelevant to whether

defendant legitimately terminated his employment under subsection (a). Applying the standard

espoused by plaintiff would be contrary to the FMLA maxim that an "employee has no greater

right to reinstatement or to other benefits and conditions of employment than if the employee had

been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216.

   The only other evidence that plaintiff asserts supports a finding that his FMLA

leave constituted a negative factor in his termination is email correspondence by Smith, which he

alleges evinces a hostile attitude toward his FMLA leave. (Pl.'s Br. 15-16.) This argument is

meritless, and no reasonable jury could conclude that the emails reveal any hostility. Internal

emails between Smith and human resources department suggest she was asking for an update on

plaintiff's FMLA status, nothing more. (Cohen Decl., Ex. P, at D-000266, -287, -289.) Plaintiff

also relies on an email exchange between Smith and plaintiff in which Smith questions plaintiff's

absence. However, the focus of Smith's inquiry is not toward plaintiff's FMLA leave, but rather

to his failure to notify anyone that he intended to exercise his FMLA leave. (Cohen Decl., Ex.

Q, at D-000273 ("You did not contact me today regarding a scheduled or unscheduled office

absence so I am unsure why you were not at work today.") Because plaintiff continued to have

an obligation to provide reasonable notice to his employer during his absences, 29 C.F.R. §

825.303(a), this email cannot reasonably be construed as evidence that Smith was hostile to

plaintiff's leave. Plaintiff's assertion is also belied by the fact that Smith actually offered

- 15 -

plaintiff the opportunity to take FMLA leave in January 2013, more than a month before plaintiff

began his second FMLA leave.  (R. 56.1 Statement ¶ 116.)

　　　　Lastly, plaintiff asserts that his interference claim is nevertheless cognizable,

because many, if not all, of his job performance issues were caused by his mental health issues.

(Pl.'s Br. 16.)  Critical to the success of an FMLA interference claim, however, is evidence that

an employer interfered with an employee's FMLA leave.  That is, an employer cannot be liable

in the absence of FMLA leave or an attempt to take FMLA leave.  29 U.S.C.A. § 2615.  Here,

plaintiff only requested FMLA leave on two occasions, both of which were approved by

defendant.  The FMLA does not provide protection for plaintiff's poor performance—including

his absenteeism not covered by the FMLA—absent a request for FMLA leave.  While an

employee need not explicitly invoke the FMLA or refer to the statute when communicating his

need for leave to his employer, Slaughter v. Am. Bldg. Maint. Co. of New York, 64 F. Supp. 2d

319, 325 (S.D.N.Y. 1999), plaintiff has come forward with no evidence that he ever notified

defendant of a need for additional leave in December 2012 and January 2013.

　　　　The Court reads plaintiff's argument as an attempt to impute principles of liability

under the Americans with Disabilities Act ("ADA") onto the FMLA.  While the FMLA protects

employees from termination for exercising their right to take protected leave, the ADA protects

employees from termination on the basis of one's disability.  Compare 29 U.S.C.A. § 2615 ("It

shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the

attempt to exercise, any right provided under this subchapter.") with 42 U.S.C.A. § 12112 ("No

covered entity shall discriminate against a qualified individual on the basis of disability in regard

to . . . discharge of employees.").  Plaintiff essentially argues that he was terminated as a result of

his disability, which amounts to a claim under the ADA.  But plaintiff, represented by counsel,

- 16 -

has not brought a claim under the ADA.  Nor will the Court venture to read a claim under the ADA into plaintiff's complaint, especially in light of the fact that counsel brought a claim under the NYCHRL, New York State's ADA equivalent.

Plaintiff seeks to rely on then-District Judge Lynch's decision in <u>Roberts v. AIG Glob. Inv. Corp.</u>, No. 06 cv 5966 (GEL), 2008 WL 4444004 (S.D.N.Y. Sept. 30, 2008), asserting that an interference claim can still succeed "if his job performance was the result of the very condition that entitled him to take the FMLA leave in the first instance."  (Pl.'s Br. 16.)  Plaintiff overstates the <u>Roberts</u> holding.  In <u>Roberts</u>, the employer terminated Robert's employment after he requested FMLA leave, but before he started his leave.  <u>Id.</u> at *2.  Judge Lynch found triable issues of fact as to whether Roberts was terminated "for reasons related to his substantive entitlements under the FMLA."  However, as discussed above, plaintiff failed to show that his FMLA leave constituted a negative factor in his termination.  Interpreting <u>Roberts</u> to provide an FMLA interference claim whenever an employee's health issues cause poor job performance would require omniscience on the part of employers.  The right to reinstatement is not absolute, <u>Sista</u>, 445 F.3d at 168, and so long as plaintiff's leave did not constitute a factor in defendant's termination decision, plaintiff may properly be terminated.

ii. <u>FMLA Interference Claim – Discouragement</u>

Nor can plaintiff prevail on an interference claim based on defendant allegedly discouraging him from taking FMLA leave.  A plaintiff proceeding on a discouragement theory must show that he attempted to assert his FMLA rights but was discouraged from doing so in such a way that would have "dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights."  <u>Reilly v. Revlon, Inc.</u>, 620 F. Supp. 2d 524, 535

(S.D.N.Y. 2009) (citing Golden v. New York City Dep't of Envtl. Prot., No. 06 cv 1587 (DLC),

2007 WL 4258241, at *3 (S.D.N.Y. Dec. 3, 2007), aff'd, 354 Fed. App'x 577 (2d Cir. 2009)).

      Plaintiff asserts that defendant discouraged him from taking leave on two

occasions.  First, plaintiff asserts that he was discouraged from taking FMLA leave by Smith

when she held a meeting with him on September 4, 2011, the day before he was scheduled for

his first FMLA leave.  (Pl.'s Br. 14.)  He claims that he was "berated, criticized for his work, and

that [] upon his return . . . he would have to attend training classes, provide weekly updates to

Ms. Smith, and provide more detailed deadlines."  Assuming the truth of plaintiff's allegations,

no reasonable jury could conclude that Smith and Kennard's comments were discouragement.

Critically, plaintiff does not allege that Smith or Kennard made any reference to his FMLA leave

whatsoever.  Rather, the entire meeting was devoted to discussing plaintiff's poor job

performance.  (Cohen Decl., Ex. E.)  Criticizing, even berating an employee's substantive job

performance is not enough to assert a claim for interference under a discouragement theory.  Di

Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 200 (S.D.N.Y. 2009) (granting

defendants' summary judgment motion on plaintiff's discouragement interference claim, where

"there is no evidence that [the employer] ever told [employee] that she was unhappy that he was

seeking or taking intermittent FMLA leave"); Reilly, 620 F. Supp. 2d at 536 (granting summary

judgment to defendant on plaintiff's interference claim, noting that "[t]here is no evidence that

anyone at Revlon told plaintiff she should not take her FMLA leave").

      Second, plaintiff asserts that Smith discouraged him from taking FMLA leave

with her "angry outburst in response to plaintiff's intention to take a second FMLA leave, her

refusal to sign the application with the medical certification attached and her repeated emails

putting the onus on [plaintiff] to explain the intermittent leave policy to her."  (Pl.'s Br. 14.)

Plaintiff's argument misconstrues the record.  Smith did in fact sign his FMLA application; however, her signature was contingent upon the approval of OHS because "according to [plaintiff] he had paperwork from a psychologist and he did not know if it would be sufficient for OHS approval."  (Lipton Decl, Ex. 33, at D-000776.)  Furthermore, the only emails in which Smith asks plaintiff for information regarding his leave relate to her requesting notice of the days in which he would not be in the office.  (Cohen Decl., Ex R at D-000252 ("Will you be in work next Tuesday Feb 19th?"); Cohen Decl., Ex. Q at D-000273 ("I asked you specifically what intermittent meant in terms of your needs for taking time off, and you told me that you were unclear."))  Plaintiff has failed to explain how these statements amount to anything more than routine inquiries.  Cf. Serby v. New York City Dep't of Educ., No. 09 cv 2727 (RRM) (VVP), 2012 WL 928194, at *7 (E.D.N.Y. Mar. 19, 2012) ("Plaintiff offers nothing to suggest that the warning was more than a generalized statement discouraging employee absences, undoubtedly common in almost any workplace."), aff'd, 526 Fed. App'x 132 (2d Cir. 2013).  The fact that Smith offered plaintiff the opportunity to take more FMLA leave in January 2013 also strongly rebuts plaintiff's allegations.  Reilly, 620 F. Supp. 2d at 536 (noting that plaintiff's interference claim premised on discouragement should fail because, among other reasons, the employer actually "received written communications advising her of her rights and responsibilities under Revlon's FMLA leave policies").

2.  Retaliation

FMLA also provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).  Unlike interference claims, FMLA retaliation claims

are analyzed under the burden shifting framework established in <u>McDonnell Douglas Corp. v.</u> <u>Green</u>, 411 U.S. 792 (1973). <u>Potenza</u>, 365 F.3d at 167-68.

Plaintiff bears the initial burden of establishing a prima facie case of retaliation. To make out a prima facie case, plaintiff must establish that:

> 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

<u>Id.</u> at 168. If plaintiff establishes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>McDonnell</u>, 411 U.S. at 802. If the employer satisfies this burden, "the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." <u>Richardson v. New York State</u> <u>Dep't of Corr. Serv.</u>, 180 F.3d 426, 443 (2d Cir. 1999), <u>abrogated on other grounds by</u> <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006).

    i.  <u>Step One: Plaintiff's Prima Facie Case</u>

Defendant only challenges one element of plaintiff's prima facie case. Defendant argues that plaintiff was not qualified for his position. (Def.'s Br. 18.) However, it is unusual for a plaintiff not to meet this standard, because he "need not do much to establish his qualification for the position he holds or seeks." <u>Donnelly v. Greenburgh Cent. Sch. Dist. No. 7</u>, 691 F.3d 134, 147 (2d Cir. 2012). "'[T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job.'" <u>Id.</u> (quoting <u>Slattery v.</u> <u>Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 92 (2d Cir. 2001)).

Here, despite plaintiff's minimal burden, it is unclear whether he has made a prima facie showing that he was qualified for his position.  While plaintiff argues that his employment for ten years in his position demonstrates that he had the basic skills necessary to perform his job, the uncontested record of plaintiff's performance issues raises serious doubts about his ability to perform his job.  That being said, plaintiff need only show "basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."  Slattery, 248 F.3d at 92.  Because plaintiff's retaliation claim can be resolved at step three of the analysis, the Court will assume, without deciding, that plaintiff has established a prima facie case.  See, e.g., Moorehead v. New York City Transit Auth., 385 F. Supp. 2d 248, 253 (S.D.N.Y.) ("At the outset, I assume that plaintiff has made out the prima facie case required by McDonnell Douglas."), aff'd, 157 Fed. App'x 338 (2d Cir. 2005).

ii.  <u>Step Two: Defendant's Legitimate Reason for Discharge</u>

Assuming that plaintiff has made out a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for plaintiff's termination.  Defendant has met this burden.  Specifically, Metro-North asserts that plaintiff was terminated for various instances of poor job performance, many of which predate his request for FMLA leave.  (Def.s' Br. 18-19.)  See Sutherland v. New York State Dep't of Law, 216 F.3d 1073, 2000 WL 730413, at *7 (2d Cir. June 2, 2000) (holding that poor job performance is "no doubt" a legitimate nondiscriminatory reason for termination).

iii.  <u>Step Three: Proof that FMLA Leave was the Real Reason for Plaintiff's Termination</u>

Having come forward with a non-retaliatory reason for plaintiff's termination, the burden shifts to the plaintiff to adduce evidence that would permit a reasonable jury to find that "the employer's proffered non-retaliatory reason is pretextual and that retaliation was a

'substantial reason for the adverse employment action.'"  Kaytor v. Electric Boat Corp., 609 F.3d 537, 553 (2d Cir. 2010) (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).  Here, plaintiff has failed to come forth with such evidence.  When considering the entire record, no reasonable trier of fact could conclude that plaintiff's FMLA leave constituted a substantial factor in defendant's decision to terminate his employment.[3]

Plaintiff has failed to come forward with evidence which, if believed, would enable the trier of fact to conclude that defendant's non-retaliatory reason for terminating his job performance was pretextual.  In his attempt to establish pretext, plaintiff relies only on the temporal proximity between his termination and his FMLA leave, and two email correspondence.  On this record, neither of these create a triable issue of material fact.  With respect to temporal proximity, plaintiff argues that his termination on the day he returned from FMLA leave is the "single most damning piece of evidence that his termination was the direct result of his FMLA leave."  (Def.'s Br. 18-19.)  While temporal proximity may be sufficient to prove plaintiff's prima facie case, it is insufficient, standing alone, to survive summary judgment.  El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima

---

[3] A recent Supreme Court case calls into question the causation test to be applied in FMLA retaliation cases.  In University of Texas Southwestern Medical Center v. Nassar, the Supreme Court held that in the Title VII context, retaliation "must be proved according to traditional principles of but-for causation, not the lessened [motivating-factor] causation test."  133 S. Ct. 2517, 2533 (2013).  If applied in the FMLA context, a plaintiff would need to prove that he would not have been terminated *but for* his taking protected FMLA leave.  While the Second Circuit has not ruled on whether Nassar applies to the FMLA context, it has previously stated that "[t]he FMLA's anti-retaliation provision has the same underlying purpose as Title VII—and almost identical wording."  Millea v. Metro-N. R. Co., 658 F.3d 154, 164 (2d Cir. 2011).  Lower courts are split on whether to apply the less stringent motivating factor test or the "but-for" test.  Compare Woods v. Start Treatment & Recovery Centers, Inc., No. 13 cv 4719 (AMD) (SMG), 2016 WL 590458, at *3 (E.D.N.Y. Feb. 11, 2016) (applying the but-for test) with Matye v. City of New York, No. 12 cv 5534 (NGG) (VVP), 2015 WL 1476839, at *18 (E.D.N.Y. Mar. 31, 2015) (applying the motivational factor test).  The Court need not resolve this dispute, however, since plaintiff fails to adduce evidence even under the less stringent standard.

facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to prove forward some evidence of pretext."); Davies v. New York City Dep't of Educ., 563 Fed. App'x 818, 820-21 (2014) ("We have been clear that temporal proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext . . . .").

Importantly, plaintiff's reliance on temporal proximity does nothing to refute defendant's proffered non-retaliatory reason for his termination.  Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 291 (S.D.N.Y. 1999) ("Despite the temporal correlation between plaintiff's filing of the EEOC charge and his termination, he has failed to establish that S & P's proffered reason for dismissing him, his misconduct, was false and that unlawful retaliation was the true reason for his discharge."), aff'd, 205 F.3d 1327 (2d Cir. 2000).  Plaintiff does not dispute that he had difficulty working on multiple tasks and concentrating at work, or that he worked on personal matters while at work.  Nor does he dispute that his wife continuously sent inappropriate emails to Smith.  Perhaps most evident of plaintiff's poor job performance, however, is his excessive absenteeism, which was completely unrelated to his FMLA leave.  In December 2012, plaintiff only worked six full days and two partial days, and in January 2013, he only worked four full days and five partial days.  Plaintiff's lengthy and undisputed record of poor job performance that predated his FMLA leave weighs heavily against any inference that may arise from temporal proximity.  Slattery, 248 F.3d at 95 ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Plaintiff's reliance on temporal proximity is further undercut by events that predate plaintiff's FMLA leave.  The record shows that plaintiff's job performance was suffering

long before he requested FMLA leave, that he was referred to remedial training, and that he was

warned that he would be terminated unless his job performance improved in September 2012.

Similarly, progress notes from October 2012 kept by plaintiff's therapist reveal that plaintiff

admitted that "he was warned that he may be let go if he doesn't become more productive."  The

fact that these warnings predate plaintiff's request for leave also weakens the inference of a

causal connection between the two events.  Baez v. New York, 629 Fed. App'x 116, 119 (2d Cir.

2015) (holding in the context of a Title VII retaliation claim that "the fact that the alleged

retaliatory course of conduct began long before [the protected activity] undercuts any inference

of a causal connection between the two").  In addition, defendant previously approved plaintiff's

request for FMLA leave.  Not only that, Smith affirmatively offered plaintiff the option of taking

FMLA leave in January 2013, which defendant rejected.  Defendant's willingness to allow

plaintiff to take FMLA leave prior to his termination also leaves little room to infer that the

temporal proximity of plaintiff's termination to his FMLA leave support his retaliation claim.

Woldeselassie v. Am. Eagle Airlines, Inc., No. 15-421-cv, 2016 WL 1613028, at *1 (2d Cir.

Apr. 22, 2016) (holding that summary judgment was appropriate with respect to plaintiff's

retaliation claim because, among other things, the "record reflects that [plaintiff] had exercised

her right to FMLA leave in the past without any negative consequences").

        Plaintiff finally relies on two additional items of correspondence to support his

claim that his poor performance was a pretext for his termination.  However, when these emails

are considered in the context of the entire record, as the Court must at this stage, they do not

amount to "sufficient potential proof for a reasonable jury to find the proffered legitimate reason

merely a pretext for impermissible retaliation."  Richardson, 180 F.3d at 443.  In the context of

plaintiff's lengthy and undisputed poor job performance, the emails amount to nothing more than

defendant evidencing the process of terminating plaintiff's employment based on his poor performance.

First, in an email chain dated February 26, 2013, Smith emailed Cortez and others a detailed description of plaintiff's poor job performance.  (Cohen Decl., Ex. S at D-000808.) Directly above Smith's email, a handwritten note states, "we have no documents to prove." Plaintiff alleges that this statement indicates that his poor job performance was merely a pretext for his termination.  However, there is no relationship between this email and plaintiff's FMLA leave.  When the words, "we have no documentation to prove" are considered in their context, the only reasonable conclusion is that the statement refers to the subject matter of Smith's initial email, which is plaintiff's poor job performance, not his FMLA leave.  See Serby v. New York City Dep't of Educ., 526 Fed. App'x 132, 134 (2d Cir. 2013) (interpreting statements by employer in the context of their use to affirm the district court's granting of summary judgment in an FMLA retaliation case).

In a second email dated March 12, 2013, Mr. Kennard's assistant, Diana Garcia stated that "his manager is building a very strong case," referring to Smith working towards justifying plaintiff's termination.  (Cohen Decl., Ex. G at D-000814.)  Again, plaintiff alleges that this email proves that defendant's justification for his termination was pretexual.  This email also bears no relationship to plaintiff's FMLA leave, and does not nothing to show that defendant's reason for terminating plaintiff was pretextual.  Garcia is seeking plaintiff's attendance records from 2009, a year which predates plaintiff's request for leave.  The fact that Smith was "building a case" to justify plaintiff's termination does not, in itself, prove pretext.  In the context of plaintiff's poor job performance, plaintiff does not offer any explanation as to how this email is inconsistent with plaintiff being terminated for his job performance.  See Hale v.

- 25 -

Mann, 219 F.3d 61, 70 (2d Cir. 2000) (affirming summary judgment where employee "presented no evidence indicating that the termination decision was related to his FMLA leave."); Sista, 445 F.3d at 176 ("[Plaintiff] cannot show that [the employer] considered his FMLA leave and request to return a negative factor in its decision to terminate him.").

To rebut defendant's explanation of the non-retaliatory reason for terminating his employment, plaintiff was required to produce "'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by [Metro-North] were false, and that more likely than not discrimination was the real reason for the employment action.'" Serby, 526 Fed. App'x at 135 (quoting Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)).  Plaintiff has failed to produce such evidence, and the Court concludes that there is no genuine issue of material fact that would permit a reasonable jury to conclude that plaintiff's termination based on poor job performance was merely pretextual.

## II.  NYCHRL Claim

Plaintiff's only remaining claims arise under New York law.  A court has the discretion to exercise supplemental jurisdiction over state law claims when there is no longer a basis for federal jurisdiction.  See 28 U.S.C. § 1367(c).  In deciding whether to exercise jurisdiction over supplemental state law claims, district courts are required to balance the values of judicial economy, convenience, fairness, and comity.  Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Based on an application of the Cohill factors, the Court will not exercise supplemental jurisdiction over plaintiff's remaining state law claims.  Although the parties have completed discovery, courts have held that "where the federal claims are dismissed before trial, the state claims should be dismissed as well."  Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir.

1998).  Furthermore, plaintiff's remaining claims under the NYCHRL raise entirely distinct legal

issues from his FMLA claims.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726–27 (1966)

("[I]f it appears that the state issues substantially predominate, . . . the state claims may be

dismissed without prejudice and left for resolution to state tribunals.").  New York state courts

have a great interest in claims arising under the NYCHRL, because the "definition of a disability

under New York law is not coterminous with the ADA definition."  Giordano v. City of New

York, 274 F.3d 740, 754 (2d Cir. 2001).  In the absence of a federal claim, "the appropriate

analytic framework to be applied to discrimination claims based on a 'disability' as defined by

New York state and municipal law is a question best left to the courts of the State of New York."

Id.; see also Robison v. Via, 821 F.2d 913, 925 (2d Cir. 1987) (noting that it "may be an abuse of

the district court's discretion to take pendent jurisdiction of a claim that depends on novel

questions of state law").  Accordingly, the Court will not exercise supplemental jurisdiction over

plaintiff's remaining state law claims.

CONCLUSION

        For the foregoing reasons, the motion of defendant Metro-North for summary

judgment (Dkt. No. 46) is granted with respect to plaintiff's FMLA claims.  The Court declines

to exercise supplemental jurisdiction over plaintiff's state law claims against defendant Metro-

North.  The Clerk of the Court is directed to enter judgment for defendant Metro-North.

        SO ORDERED.

                                                        _____
                                                        P. Kevin Castel
                                                        United States District Judge

Dated:  New York, New York
        May 18, 2016